IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| COMMERCE BANK, CEDAR HILL CAPITAL PARTNERS, LLC, CITIZENS BANK & TRUST COMPANY, PINNACLE BANK OF SOUTH CAROLINA, WELLS RIVER, and THOMASTON SAVINGS BANK, <br><br>          Plaintiffs, <br>vs. <br><br> U.S. BANK NATIONAL ASSOCIATION, <br><br>          Defendant. | Case No. 13-00517-CV-W-BCW |

**SUGGESTIONS BY DEFENDANT U.S. BANK NATIONAL ASSOCIATION
IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

James R. Wyrsch  MOBar #20730
Marilyn B. Keller  MOBar #339179
WYRSCH HOBBS & MIRAKIAN P.C.
1000 Walnut Street
Suite 1600
Kansas City, Missouri 64106
Tel: (816) 221-0080
Fax: (816) 221-3280

*Attorneys for Defendant*
*U.S. Bank National Association*

Of Counsel:
Michael S. Kraut (Pro Hac Vice Pending)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6000
Fax: (212) 309-6001

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ................................................................................. 1

II. BACKGROUND ....................................................................................................... 4

    A.    The Trust ......................................................................................................... 4

    B.    The Role of the Servicers and the Master Servicer........................................ 4

    C.    The RMBS Trustee ......................................................................................... 6

          1.    The Role of an RMBS Trustee.............................................................. 6

          2.    Limited Duties of U.S. Bank as RMBS Trustee for the Trusts.................. 7

          3.    The RMBS Trustee Is Not Involved in, and Is  Not Responsible
              for, Servicing........................................................................................ 8

III. ARGUMENT ............................................................................................................ 9

    A.    Plaintiffs' Theory that U.S. Bank Is Responsible for Losses Allegedly
        Caused by Servicer Robo-Signing Is Not Supported by Factual
        Allegations, Is Implausible, and Is Contradicted By the PSAs........................... 10

          1.    Plaintiffs Do Not Identify the Contract Terms Purportedly
              Breached .............................................................................................. 10

          2.    Plaintiffs Plead General Allegations of Servicer Robo-Signing But
              Do Not Allege that Robo-Signing Actually Occurred in
              Connection with a Single Loan in the Trusts........................................ 11

          3.    The SAC Fails to Adequately Plead that the RMBS Trustee Had
               Knowledge of Alleged Robo-Signing By Servicers ............................. 13

          4.    U.S. Bank Had No Duty to Police Alleged Servicer Misconduct .......... 14

          5.    Plaintiffs Do Not Coherently Plead How They Were Harmed............... 15

          6.    Plaintiffs' Conflict of Interest Theory Is Implausible and Does Not
              Save the SAC ....................................................................................... 18

    B.    Each of Plaintiffs' Five Counts Fails ............................................................ 20

          1.    Count I Should Be Dismissed for the Reasons Set Forth Above............. 20

          2.    The "Tort" Claims, Should Be Dismissed for Multiple Reasons ........... 20

          3.    The Negligence Claim Is Inadequately Pled.......................................... 22

          4.    The Breach of Contract Claim Is Unintelligible ................................... 22

IV. CONCLUSION........................................................................................................ 23

Case 4:13-cv-00517-BCW   Document 25   Filed 08/05/13   Page 2 of 30

# TABLE OF AUTHORITIES

Page(s)

CASES

*AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*,
   896 N.E.2d 61 (N.Y. 2008) ..................................................................................7, 21, 22

*Ambac Indemnity Corp. v. Bankers Trust Co.*,
   573 N.Y.S.2d 204 (N.Y. Sup. Ct. 1991) ..................................................................6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .............................................................................................2, 9

*Bakhtiari v. Al-Khaledy, et al.*,
   No. 4:11-CV-971 SNLJ, 2011 WL 6945107 (E.D. Mo. Dec. 30, 2011 ..................10

*Barker v. Time Warner Cable, Inc.*,
   923 N.Y.S.2d 118 (N.Y. App. Div. 2011) ...............................................................10

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) .............................................................................................2, 9

*Block v. BAC Home Loans Servicing LP*,
   No. 11–11181, 2012 WL 2031640 (E.D. Mich. June 6, 2012) ...............................12

*Butler v. Wells Fargo Bank, N.A.*,
   No. MJG–12–2705, 2013 WL 145886 (D. Md. Jan. 11, 2013) ..............................11

*Cerecedes v. U.S. BankCorp*,
   No. CV 11-219(CAS), 2011 WL 1666938 (C.D. Cal. Apr. 29, 2011) ....................12

*CFIP Master Fund Ltd. v. Citibank, N.A.*,
   738 F. Supp. 2d 450 (S.D.N.Y. 2010)........................................................8, 18, 19

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
   70 N.Y.2d 382 (N.Y. 1987) ...............................................................................21, 22

*Crawford v. Countrywide Home Loans, Inc.*,
   647 F.3d 642 (7th Cir. 2011) .................................................................................12

*Deutsche Bank Nat'l Trust Co. v. FDIC*,
   09-CV-1656 (D.D.C. Sept. 8, 2010) ........................................................................4

*E.F. Hutton Sw. Props. II, Ltd. v. Union Planters Nat'l Bank*,
   953 F.2d 963 (5th Cir. 1992)..................................................................................19

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
   837 F. Supp. 2d 162 (S.D.N.Y. 2011).............................................................. passim

Case 4:13-cv-00517-BCW   Document 25   Filed 08/05/13   Page 3 of 30

*Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*,
  838 F.2d 66 (2d Cir. 1988).....................................................................................................19

*G.D. Searle & Co. v. Medicorp Commc'ns, Inc.*,
  843 F. Supp. 895 (S.D.N.Y. 1994) .........................................................................................21

*In re Enron Corp. Secs., Derivative & "ERISA" Litig.*,
  Nos. H-01-3624 & 03-5808, 2008 WL 744823 (S.D. Tex. Mar. 19, 2008) .............................7

*In Re: Residential Capital, LLC, et al.*,
  No. 12-12020, 2013 WL 2248980 (Bankr. S.D.N.Y. May 23, 2013) .....................................16

*Islamic Ass'n of DeSoto, Texas, Inc. v. Mortg. Elec. Registration Sys., Inc.*,
  No. 3:12–CV–0613–D, 2012 WL 2196040 (N.D. Tex. June 15, 2012)).................................12

*James v. ReconTrust Co.*,
  845 F. Supp. 2d 1145 (D. Or. 2012) .......................................................................................12

*LaSalle Bank Nat. Ass'n v. Merrill Lynch Mortg. Lending, Inc.*,
  No. 04 Civ. 5452(PKL), 2007 WL 2324052 (S.D.N.Y. Aug. 13, 2007) ................................16

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*,
  652 F. Supp. 2d 576 (E.D. Pa. 2009) ......................................................................................16

*Macawile v. Pro30 Funding*,
  No. 2:12–CV–00567–MCE–DAD, 2012 WL 2912349 (E.D.Cal. July 16, 2012) .................12

*Madlaing v. JPMorgan Chase Bank, N.A.*,
  No. CV F 12-2069(LJO), 2013 WL 2403379 (E.D. Cal. May 31, 2013) ...............................12

*Meckel v. Cont'l Res. Co.*,
  758 F.2d 811 (2d Cir. 1985)......................................................................................................7

*Metro. W. Asset Mgmt. v. Magnus Funding Ltd.*,
  No. 03 Civ. 5339(NRB) 2004 WL 1444868 (S.D.N.Y. June 25, 2004)...........................21, 22

*Mickelson v. Chase Home Fin. LLC*,
  No. C11–1445 MJP, 2011 WL 5553821 (W.D. Wash. Nov. 14, 2011) .................................12

*Millennium Partners, L.P. v. U.S. Bank Nat'l. Ass'n*,
  No. 12 Civ. 7581(HB), 2013 WL 1655990 (S.D.N.Y. Apr. 17, 2013).............................21, 22

*Nottage v. Bank of N.Y. Mellon*,
  No. 12–00418 JMS, 2012 WL 5305506 (D. Haw. Oct. 25, 2012) .........................................12

*OEI v. Citibank, N.A.*,
  957 F. Supp. 492 (S.D.N.Y. 1997) .........................................................................................21

*Orzoff v. Bank of Am., N.A.*,
2:10-cv-2202(JCM), 2011 WL 1539897 (D. Nev. Apr. 22, 2011) .........................................12

*Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*,
Nos. 84152, 98 CIV 6907, 2000 WL 877004 (S.D.N.Y. June 30, 2000) ................................19

*Peak Partners, L.P. v. Republic Bank*,
191 F. App'x 118 (3d Cir. 2006) .............................................................................................6

*Peterson v. GMAC Mortg., LLC*,
No. 11–11115–RWZ, 2011 WL 5075613 (D. Mass. Oct. 25, 2011) ......................................12

*Porous Media Corp. v. Pall Corp.*,
186 F.3d 1077 (8th Cir. 1999) .................................................................................................2

*Raymond James & Assoc. v. Bank of N.Y. Trust Co.*,
No. 8:07-CV-239-T-27(TBM), 2008 WL 4279629 (M.D. Fla. Sept. 18, 2008) ....................22

*Schultz v. BAC Home Loans Servicing, LP*,
No. CV–11–00558–PHX–NVW, 2011 WL 3684481 (D. Ariz. Aug. 23, 2011) ....................12

*Sembly v. U.S. Bank Nat'l Ass'n.*,
No. 11-12322, 2012 WL 32737 (E.D. Mich. Jan. 6, 2012) ...................................................12

*Toone v. Wells Fargo Bank, N.A.*,
716 F.3d 516 (10th Cir. 2013) ...............................................................................................11

*US Bank Nat'l Assoc. v. Ibanez*,
941 N.E.2d 40 (Mass. 2011) ...................................................................................................8

*VNB Realty, Inc. v. Bank of Am. Corp.*,
No. 11-CIV-6805(PGG), 2012 WL 7656776 (S.D.N.Y. Dec. 19, 2012) ..............................16

*Wells Fargo Bank, N.A. v. La Salle Bank Nat'l Ass'n*,
643 F. Supp. 2d 1014 (2009) .................................................................................................16

*Wells Fargo Bank, N.A., v. LaSalle Bank Nat'l Ass'n*,
No. 307CV00449, 2008 WL 2611541 (S.D. Ohio Apr. 22, 2008) ........................................16

*Wells Fargo Bank, N.A., v. LaSalle Bank Nat'l Ass'n*,
No. 11-C-166, 2011 WL 2470635 (N.D. Ill. June 20, 2011) .................................................16

*Zimmerman v. Nolker*,
No. 08-4216-CV-C-NKL, 2008 WL 5432286 (W.D. Mo. Dec. 31, 2008) .............................2

## STATUTES

15 U.S.C. § 77ccc (1990) .........................................................................................................6

- iii -

**OTHER AUTHORITIES**

Talcott J. Franklin and Thomas F. Nealon III, Mortgage and Asset Backed Securities
    Litigation Handbook .................................................................................................5, 8, 13

Claire M. Robinson, *Moody's Re-examines Trustees' Role in ABS and RMBS*, Moody's
    Investors Service (Feb. 4, 2003) ...........................................................................................13

Defendant U.S. Bank National Association ("U.S. Bank") respectfully submits the following suggestions in support of its motion to dismiss all claims in Plaintiffs' Second Amended Complaint dated June 18, 2013 in the above-captioned matter (the "SAC").[1]

## I.    PRELIMINARY STATEMENT

Plaintiffs invested in various complex residential mortgage-backed securitization ("RMBS") trusts (the "Trusts") during the height of the housing market bubble. These Trusts are backed by pools of housing loans, and Plaintiffs' investments are tied to the mortgage payments made by individual borrowers on their mortgage loans.

The rights and obligations of the parties that structured and/or administer the Trusts are spelled out in lengthy, detailed governing agreements (typically pooling and servicing agreements, or "PSAs"). U.S. Bank serves as the "RMBS Trustee" for the Trusts, and its limited responsibilities as Trustee are described in these PSAs. Although this is, at bottom, a breach of contract case, **Plaintiffs do not cite a single provision of the PSAs purportedly breached by U.S. Bank**. This is not surprising because the PSAs directly contradict Plaintiffs' theory.

The underlying residential mortgage loans held in the Trusts are serviced on a daily basis by other financial institutions, known as mortgage "servicers." The servicers are solely responsible for collecting mortgage loan payments and, if a borrower defaults on a mortgage loan, initiating and directing foreclosure proceedings. The mortgage loans in the Trusts are serviced by 35 different servicers. None is serviced by U.S. Bank, and in fact, the PSAs expressly provide that U.S. Bank *cannot* be liable for the servicers' conduct.

While Plaintiffs recite a litany of complaints about mortgage servicers, their convoluted theory against U.S. Bank appears to be that: (i) certain mortgage servicers engaged in purported

---

[1]  Citations to "¶ __" refer to the SAC. Plaintiffs Citizens Bank and Pinnacle have voluntarily dismissed their respective claims without prejudice. Docket No. 22.

improprieties when signing foreclosure-related documents (which Plaintiffs label "robo-signing"); (ii) as a result of regulatory settlements by servicers and the implementation of new foreclosure laws and procedures implemented to prevent servicers' robo-signing, the costs of foreclosures are now higher than when Plaintiffs invested in the Trusts; and (iii) U.S. Bank failed to stop mortgage servicers from robo-signing.  Although the robo-signing was allegedly done by servicers, no servicer was sued in this action because, under the governing PSAs, Plaintiffs lack standing to sue the servicers or any other party except the RMBS Trustee.[2]  As a result, Plaintiffs have attempted to conjure up a theory to pin their losses on U.S. Bank, the only party that they may have standing to sue, but the theory cannot pass muster under the pleading and plausibility requirements of *Iqbal* and *Twombly*.   In particular:

- As a threshold matter, the SAC fails to allege that *any* mortgage loan documents relating to the Trusts were robo-signed.  As to the 35 servicers who service the loans in the Trusts, Plaintiffs allege only that a few were linked to robo-signing and, even as to those few, Plaintiffs draw no nexus between alleged robo-signing generally and any loan in the Trusts or any loss incurred by Plaintiffs.

- Plaintiffs' claims are based on a theory that U.S. Bank breached a contractual duty to prevent servicing problems.  But Plaintiffs cite no contract provision that U.S. Bank

---

[2]  *See*, *e.g.*, the "no-action" clause in the exemplar PSA annexed as Exhibit A to the Declaration of Ariane S. Baczynski dated Aug. 5, 2013 ("Baczynski Decl.") § 8.01(b).  Such "no-action" clauses are enforced against all parties except trustees.  *See Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 192 (S.D.N.Y. 2011) (no-action clause excused in litigation against indenture trustees).  Space constraints prohibit Defendant from addressing the governing documents for each of the 29 Trusts in which Plaintiffs purportedly invested.  Accordingly, for ease of reference, Defendant has selected one Trust from the SAC to use as an example (J.P. Morgan Alternative Loan Trust 2006-S3 ("JPALT 2006-S3")), and all references to "PSA" throughout this memorandum refer to the PSA for that Trust, Baczynski Decl. Ex A.

PSAs for trusts that have publicly traded securities are available on the website of the U.S. Securities and Exchange Commission (the "SEC").  The Court may consider them, other publicly-filed documents, and documents incorporated by reference in the SAC when adjudicating this motion.  *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (court "may consider some materials that are part of the public record . . . as well as materials that are necessarily embraced by the pleadings." (quotations omitted)); *Zimmerman v. Nolker*, No. 08-4216-CV-C-NKL, 2008 WL 5432286, at *1 n.1 (W.D. Mo. Dec. 31, 2008) (taking judicial notice of documents outside the pleadings).

purportedly breached, and the PSAs expressly provide that U.S. Bank has no obligation to ferret out such issues.

- Plaintiffs assert that U.S. Bank was put on notice of servicers' robo-signing by settlements by certain servicers with the Federal Reserve Board (the "FRB") and Office of the Comptroller of the Currency (the "OCC") in April 2011. Those settlements—which did not involve most servicers of the Trusts—imposed on settling servicers detailed obligations to enhance their signing practices and identify and remediate prior issues. Thus, even if U.S. Bank had a duty to find and stop robo-signing, which it did not, the issue was identified and addressed in the document that purportedly put U.S. Bank on notice.

- Plaintiffs' damages theory makes no sense. Plaintiffs argue that regulatory settlements and laws designed to prevent robo-signing led to increased costs and a slower "enhanced foreclosure process." ¶¶ 46, 58. Of course, the RMBS Trustee did not implement those laws, did not agree to insure investors against the possibility that states might enhance their foreclosure processes (to address the servicing conduct about which Plaintiffs complain), and the RMBS Trustee's failure to identify and stop robo-signing is not what caused this purported harm.

Besides these flaws, which are fatal to the SAC, the specific claims fail for other reasons. Count I is a contract claim that is based on a theory that U.S. Bank had discretion to act but failed to do so because of a purported conflict of interest. Plaintiffs fail to establish an actual conflict and fail to plead that U.S. Bank would have acted differently absent the so-called conflict because U.S. Bank never assumed a duty to police servicers' conduct. U.S. Bank's limited role as Trustee is specifically defined in the PSAs, and no breach occurred.

Counts II and III are tort claims that are based on the same theory as Count I. They fail for the same reasons, as well as additional reasons, namely that they are duplicative of the contract claim and because U.S. Bank does not owe a fiduciary duty to Plaintiffs.

Count IV for negligence should be dismissed because it is duplicative, as Plaintiffs do not explain how U.S. Bank was negligent other than by breaching its contractual obligations.

Count V for breach of an express contract fails because it is unintelligible and does not even identify a contract provision that U.S. Bank purportedly breached.

For these reasons and others explained below, Plaintiffs have not come close to stating a claim against Defendant, and the Court should dismiss the SAC.

## II.    BACKGROUND

Plaintiffs are four sophisticated financial institutions.[3]  Their claims relate to their investment in certificates of the RMBS Trusts.  By way of background, RMBS Trusts are created through an economic transaction between a sponsor that sells mortgage loans through an affiliate, and certificateholders, such as Plaintiffs, who are investors seeking to purchase beneficial interests in those mortgage loans.  All other parties to the transaction, including the RMBS Trustee, are service providers that do not have economic risk in the transaction, and their limited duties are defined by the terms of the PSAs, as explained below.

### A.    The Trust

The Trusts are governed by New York law.  PSA, Baczynski Decl., Ex. A, § 12.06.  The RMBS Trustee, for the benefit of the certificateholders of the Trust, holds legal title to a pool of mortgage loans pursuant to PSAs.  *See*, *e.g*., *id.* at § 2.01(a).  RMBS trusts have no employees, officers, or directors.  Instead, other parties, including the servicer, the master servicer, the RMBS trustee, and the securities administrator, act on behalf of certificateholders of the trust.

### B.    The Role of the Servicers and the Master Servicer

As Plaintiffs' counsel has explained in other litigation, a "servicer is the day-to-day administrator to the mortgage loan assets held by the trust."[4]   Servicers, not trustees, maintain

---

[3]  For example, Commerce Bancshares, Inc., the parent of the first-named defendant, Commerce Bank, describes itself as "one of the nation's top 50 bank holding companies," and, as of its most recent public filing, owned more than $22 billion in assets, including more than $3.8 billion in mortgage-backed securities.  *See* Commerce Bancshares, Inc. Form 10-K for the Fiscal Year 2012, Baczynski Decl., Ex. B, at pp. 3 & 50.

[4] *See* Amended Complaint, *Deutsche Bank Nat'l Trust Co. v. FDIC*, 09-CV-1656, Dkt. No. 32, ¶28.d (D.D.C. Sept. 8, 2010).

the day-to-day relationship with individual mortgage borrowers by sending statements, performing customer service, collecting payments, sending correspondence, notifying borrowers upon a default, working with borrowers to cure a default or modify a loan when appropriate and, if necessary, instituting foreclosure actions.[5]

The PSAs appoint a "Master Servicer" that "is responsible for management of the loan portfolio owned by the trust, including establishing policies and procedures for servicing . . . ." Talcott J. Franklin and Thomas F. Nealon III, Mortgage and Asset Backed Securities Litigation Handbook ("T. Franklin ABS Handbook"), §1:8; SAC, at ¶ 23 ("As the Master Servicer is ultimately responsible for the servicing…"). Under the PSA, the Master Servicer "shall monitor the performance of the Servicers under [servicing agreements], and shall use its reasonable good faith efforts to enforce the obligations of the Servicers to duly and punctually to perform all of their respective duties and obligations thereunder." PSA, Baczynski Decl., Ex. A, § 9.01(a).

Plaintiff alleges that Wells Fargo served as Master Servicer for all of the Trusts, which is incorrect because Citimortgage, Inc. and Residential Funding Corporation, not Wells Fargo, acted as Master Servicers of some of the Trusts. More importantly, *at least 35 different entities actually serviced loans in the Trusts*:

| | | | | |
|---|---|---|---|---|
| ABN AMRO Mortgage Group, Inc. | Ameriquest Mortgage Company | Aurora Loan Services, LLC | Avelo Mortgage LLC | Bank of America, N.A. |
| Cenlar, FSB | CitiMortgage, Inc | Colonial Savings, FA | Countrywide Home Loans Servicing LP | Fifth Third Mortgage Corporation |
| GreenPoint Mortgage Funding, Inc. | GMAC Mortgage Corp. | HomeEq Servicing Corp. | Homecomings Financial, LLC. | HSBC Mortgage Corp. |

---

[5] The servicing terms are set forth in an agreement that is referenced in the PSA. *See* Baczynski Decl., Ex. A, §2.01(a); *Id.* at § 1.01 Definitions of "Servicing Agreement" and "Wells Fargo Servicing Agreement"; *Id.* at Ex. E.

| | | | | |
|---|---|---|---|---|
| Impac Funding Corp. | IndyMac Bank, F.S.B. | JPMorgan Chase Bank, N.A. | MidAmerica Bank | National City Mortgage Co. |
| New Century Mortgage Corporation | Ocwen Loan Servicing, LLC | Opteum Financial Services, LLC | Option One Mortgage Corp. | PHH Mortgage Corp. |
| PNC Bank | Residential Funding Corp. | Select Portfolio Servicing, Inc. | SunTrust Mortgage, Inc. | Standard Mortgage Corp. |
| UBS Real Estate Securities, Inc | Universal Master Servicing, LLC | U.S. Central Federal Credit Union | Wachovia Mortgage Corp, | Washington Mutual Bank |

Baczynski Decl., Ex. C.  None of these servicers is a defendant in this action.

    **C.**    **The RMBS Trustee**

U.S. Bank is the RMBS Trustee of the Trusts at issue in this lawsuit, and its limited role and responsibilities are explained below.

    1.    The Role of an RMBS Trustee

The label "trustee" often leads to a misperception about the role of an RMBS trustee or other "indenture trustee, which has been long recognized and which is a reality of modern commercial finance." *Ambac Indemnity Corp. v. Bankers Trust Co.,* 573 N.Y.S.2d 204, 207 (N.Y. Sup. Ct. 1991).[6]  An indenture trustee has been described by the Third Circuit as a "different legal animal" than an ordinary trustee.  *Peak Partners, L.P. v. Republic Bank*, 191 F. App'x 118, 122 (3d Cir. 2006).  The Second Circuit has explained the distinction:

> Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder **whose duties and obligations are exclusively defined by the terms of the indenture agreement**.

---

[6]  "Indenture trustee" is the term for a trustee named under an agreement under which securities are outstanding or are to be issued (*e.g.*, a PSA).  *See* 15 U.S.C. § 77ccc.

*Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985) (emphasis added).[7]   Courts recognize that, prior to an Event of Default (no such event is alleged in the SAC), indenture trustees *do not* owe a fiduciary duty to investors.   *See AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 896 N.E.2d 61, 66-67 (N.Y. 2008).[8]  The notion that indenture trustees' duties are limited to those expressly set forth in the PSA is not only recognized by law but explicitly is set forth in the PSA as well.  *See* PSA, Baczynski Decl. Ex. A, §6.01(a) ("The Trustee … undertakes to perform such duties **and only such duties** as are specifically set forth in this Agreement." (emphasis added)).

### 2.    Limited Duties of U.S. Bank as RMBS Trustee for the Trusts

The few duties that the RMBS Trustee actually assumed that may be relevant to this case include: (i) nominally holding legal title to the Trust Fund for the benefit of certificateholders in the Trust (*Id.* at §§ 2.01-02); (ii) reviewing the form (but *not* the content) of certain "certifications" that the RMBS Trustee receives from service providers, such as the servicer (*Id.* at §§ 6.01(b), (h), (l)); and (iii) conducting certain investigations but *only* if directed to do so in writing by a defined threshold percentage of certificateholders who agree to indemnify the RMBS Trustee for its fees, expenses, and liability (*Id.* at §6.02(iv)).  Plaintiffs do not allege that they or any other investor directed U.S. Bank to conduct any investigations concerning alleged servicer robo-signing.[9]

---

[7]   *See also In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, Nos. H-01-3624 & 03-5808, 2008 WL 744823, at *8 n.22 (S.D. Tex. Mar. 19, 2008) (explaining that prior to an Event of Default, an indenture trustee has virtually no obligations to investors).

[8] *See also Ellington*, 837 F. Supp. 2d at 192 (explaining that the trustee has no pre-default fiduciary duties).

[9] As explained herein, RMBS trustees have limited duties and the protection of broad exculpatory clauses, but the tradeoff is modest compensation.  In one analogous case, a court rejected an argument by investors that they expected the indenture trustee to act to protect their financial interests, recognizing that the trustee's compensation, which the court described as

The PSAs governing most of the Trusts also appoint another entity, known as Securities Administrator or Trust Administrator, to perform ministerial duties that sometimes are assigned to an RMBS trustee. Those duties involve calculating monthly payments to each class of certificateholders from amounts collected by servicers; preparing monthly distribution reports to certificateholders; and preparing SEC and tax filings on behalf of the Trust. *Id.* at §§ 4.01(d), 10.01(d). The appointment of a Securities Administrator to perform these ministerial functions means that the RMBS Trustee has even fewer duties than with respect to some other trusts.

        3.     The RMBS Trustee Is Not Involved in, and Is
                   Not Responsible for, Servicing

Under the PSAs, the RMBS Trustee is not responsible for servicing loans or foreclosing if a borrower defaults on his or her loan, and the SAC does not contend otherwise. Nor could it, as Plaintiffs' counsel has written a treatise that could not be clearer on this point:

> [S]ervicers are responsible for enforcing the terms of a defaulted securitized loan. This responsibility may include . . . foreclosing on the property and/or in a commercial context pursuing other related remedies such as exercising an assignment of leases and rents, appointing a receiver of rents, etc.

T. Franklin ABS Handbook, § 5:106. The SAC acknowledges that foreclosure actions brought in the RMBS Trustee's name are brought by servicers (or master servicer), not trustees. ¶ 26.[10]

---

"pocket change in comparison to all other economic aspects of [the] transaction," was itself evidence of the limited role contemplated for the trustee. *CFIP Master Fund Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 474 (S.D.N.Y. 2010).

[10] For this reason, Plaintiffs' allegation, citing *US Bank Nat'l Assoc. v. Ibanez*, 941 N.E.2d 40 (Mass. 2011), that "U.S. Bank, itself has engaged in filing flawed and misleading documents relating to foreclosures" (¶ 44) is misleading. The purportedly ineffective mortgage assignment in *Ibanez* was signed by Option One, the designated servicer under the applicable PSA, not by U.S. Bank. 941 N.E.2d at 46-48.

The PSA also expressly provides that the RMBS Trustee has no responsibility for monitoring servicers' performance and expressly exculpates the RMBS Trustee from liability for errors or omissions by the servicer. These provisions include the following:

- "[N]one of the provisions contained in this Agreement shall in any event require the Trustee or the Securities Administrator to perform, or be responsible for the manner of performance of, any of the obligations of the Master Servicer under this Agreement or the Servicers under the Purchase and Servicing Agreements." PSA, Baczynski Decl., Ex. A, §§ 6.01(c)(iv) & (f).

- "Neither the Trustee nor the Securities Administrator shall be responsible for any act or omission of the Master Servicer, the Depositor, the Seller, any Servicer or any Custodian." *Id.* at §6.01(c)(v).

Instead, on an annual basis, the servicer must certify its compliance with applicable agreements and servicing criteria. *Id.* at § 11.05. Unless directed by certificateholders to investigate, the RMBS Trustee is expected to rely upon such certifications and, per the PSA, has no obligation whatsoever to "confirm or verify the contents of any reports or certificates of the Master Servicer or any Servicer delivered to the Trustee." *Id.* at § 6.01(h); *see also id.* at §§ 6.01(b) & (l).

The complete absence of a role for the RMBS Trustee in connection with servicing cannot be overstated in this case, as it highlights a fatal flaw in Plaintiffs' theory, which attempts to hold U.S. Bank liable for alleged servicing misconduct.

## III. <u>ARGUMENT</u>

Plaintiffs' claims are premised on the theory that they suffered economic losses because U.S. Bank breached a purported obligation to stop alleged robo-signing by servicers. This theory, however, is fundamentally flawed both in concept and presentation. Plaintiffs have not met the requirements of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 557 (2007) to present well-pled factual allegations that support plausible claims.[11]  As a result, the SAC should be dismissed.

### A. Plaintiffs' Theory that U.S. Bank Is Responsible for Losses Allegedly Caused by Servicer Robo-Signing Is Not Supported by Factual Allegations, Is Implausible, and Is Contradicted By the PSAs

#### 1. Plaintiffs Do Not Identify the Contract Terms Purportedly Breached

This action is, at bottom, a breach of contract case, as the SAC alleges that a conflict of interest caused U.S. Bank not to exercise a discretionary right under the PSA contract.  ¶¶ 68-77 & 84-88.  Even the breach of fiduciary duty and negligence claims arise out of an alleged failure to take action under the PSA.  ¶¶ 91-93 & 100-102.  However, the SAC fails to identify a single provision of the PSA that was purportedly breached.  The SAC should be dismissed on this ground alone. *See Ellington*, 837 F. Supp. 2d at 189 ("To plead these elements [of a breach of contract claim] 'a plaintiff must identify what provisions of the contract were breached . . . .'" (citations omitted)); *Barker v. Time Warner Cable, Inc.*, 923 N.Y.S.2d 118, 120 (N.Y. App. Div. 2011) (to state a breach of contract claim, plaintiffs' allegations must identify the relevant contract provisions); *see also Bakhtiari v. Al-Khaledy, et al.,* No. 4:11-CV-971 SNLJ, 2011 WL 6945107, at *4 (E.D. Mo. Dec. 30, 2011) (plaintiff must plead more than "vague references to agreements" and provisions allegedly breached to state a claim for breach of contract.).

---

[11] In evaluating a motion to dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6), a court must: (1) "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth;" and (2) if "there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.  A complaint first must contain factual allegations that support a claim and cannot merely contain "naked assertions" lacking any "further factual enhancement." *Id.* at 678.  A court need not accept as true legal conclusions. *Id.*  The facts that a plaintiff alleges must support a claim that is plausible, not merely possible. *Twombly*, 550 U.S. at 557.

2.		**Plaintiffs Plead General Allegations of Servicer Robo-Signing But Do Not Allege that Robo-Signing Actually Occurred in Connection with a Single Loan in the Trusts**

"Robo-signing" is not defined in any statute or dictionary. Plaintiffs use it to mean "the practice of signing mortgage assignments, satisfactions and other mortgage-related documents in assembly-line fashion, often with a name other than the affiant's own, and swearing to personal knowledge of facts of which the affiant has no knowledge." ¶ 38.

Critically, Plaintiffs do not plead that such robo-signing actually occurred in connection with the Trusts in which they invested or how it caused their losses. While Plaintiffs point to regulatory investigations and settlements by several mortgage servicers, the SAC does not allege that a single document in a single foreclosure in any of the Trusts in which Plaintiffs invested was robo-signed, that U.S. Bank was aware that any document was robo-signed, or that robo-signing of a particular document led to a single dollar of loss to Trust investors. None.

Instead, the SAC sets forth a general critique of the mortgage servicing industry and an account of regulatory settlements by a small percentage of the servicers of the Trusts. Such generalities are insufficient to withstand a motion to dismiss. Numerous courts have rejected similar attempts by plaintiffs to rely on conclusory allegations of robo-signing based on general information unhinged to the loans or trusts at issue. For example, in *Toone v. Wells Fargo Bank, N.A.* 716 F.3d 516 (10th Cir. 2013), the plaintiff-borrowers asserted a claim for wrongful foreclosure based on the allegation that the endorsement of their note was robosigned. The Tenth Circuit held that such bald and conclusory allegations were insufficient because the plaintiffs failed to allege any facts indicating that the endorsement on *their* note was robo-signed:

> [The complaint] does not explain what "robo-signing" is or why it renders the endorsements fraudulent, let alone include factual content indicating that it occurred in this case. Numerous courts have held that bald allegations of "robo-signing" do not suffice under the Rule 8(a)(2) standard set by *Iqbal*.

*Toone*, 716 F.3d at 521 (collecting cases).

Similarly, in *Butler v. Wells Fargo Bank, N.A.*, No. MJG–12–2705 2013 WL 145886, (D. Md. Jan. 11, 2013), the District Court dismissed wrongful foreclosure claims against a bank based on media reports of robo-signing, holding that such allegations "provide a quintessential example of the type of formulaic recitation that is manifestly inadequate to present a plausible claim." *Butler*, 2013 WL 145886 at *3. Numerous courts have reached the same conclusion. *See, e.g.*, *Madlaing v. JPMorgan Chase Bank, N.A.*, No. CV F 12-2069(LJO), 2013 WL 2403379 (E.D. Cal. May 31, 2013) (vague and conclusory allegations of robo-signing were inadequate to defeat a motion to dismiss).[12]

This failure to link robo-signing with the Trusts is exacerbated here by the fact that the SAC focuses exclusively on purported robo-signing *by Wells Fargo*. Wells Fargo is one of three Master Servicers of the Trusts, and dozens of other servicers serviced loans in the Trusts. Most of those servicers—the entities that would sign documents in foreclosures—are not even mentioned in the SAC, much less accused of robo-signing.

---

[12] *See also*, *e.g.*, *Cerecedes v. U.S. BankCorp,* No. CV 11-219(CAS), 2011 WL 1666938, at *4 (C.D. Cal. Apr. 29, 2011); *Crawford v. Countrywide Home Loans, Inc.,* 647 F.3d 642, 645 (7th Cir. 2011); *Nottage v. Bank of N.Y. Mellon*, No. 12–00418 JMS, 2012 WL 5305506, at *6 (D. Haw. Oct. 25, 2012); *Macawile v. Pro30 Funding*, No. 2:12–CV–00567–MCE–DAD, 2012 WL 2912349, at *2 (E.D.Cal. July 16, 2012); *Islamic Ass'n of DeSoto, Texas, Inc. v. Mortg. Elec. Registration Sys.*, Inc., No. 3:12–CV–0613–D, 2012 WL 2196040, at *3 (N.D. Tex. June 15, 2012); *Block v. BAC Home Loans Servicing LP*, No. 11–11181, 2012 WL 2031640, at *4 (E.D. Mich. June 6, 2012); *James v. ReconTrust Co.*, 845 F. Supp. 2d 1145, 1169 (D. Or. 2012); *Sembly v. U.S. Bank Nat'l Ass'n.,* No. 11-12322, 2012 WL 32737, at *3 (E.D. Mich. Jan. 6, 2012); *Mickelson v. Chase Home Fin. LLC*, No. C11–1445 MJP, 2011 WL 5553821, at *3 (W.D. Wash. Nov. 14, 2011); *Peterson v. GMAC Mortg., LLC*, No. 11–11115–RWZ, 2011 WL 5075613, at *5 (D. Mass. Oct. 25, 2011); *Schultz v. BAC Home Loans Servicing, LP,* No. CV–11–00558–PHX–NVW, 2011 WL 3684481, at *2 (D. Ariz. Aug. 23, 2011); *Orzoff v. Bank of Am., N.A.*, 2:10-cv-2202(JCM), 2011 WL 1539897, at *3 (D. Nev. Apr. 22, 2011).

3.     The SAC Fails to Adequately Plead that the RMBS
       Trustee Had Knowledge of Alleged Robo-Signing By Servicers

Plaintiffs do not allege that U.S. Bank was aware of robo-signing by the servicers for the Trusts before such practices came to light.  Instead, Plaintiffs claim that U.S. Bank "was imputed with the knowledge" of servicers robo-signing in April 2011, when settlements between certain servicers and the FRB and the OCC were announced.  ¶ 94.  According to Plaintiffs, once the settlements were announced, U.S. Bank "should have acted to protect the Plaintiffs."  *Id.*

This theory of liability does not hold water.  The settlements came during and after six months of investigations by a 50-state Mortgage Foreclosure Multistate Group and the federal government, including a Congressional Oversight Panel, the FRB, the OCC, the Office of the Inspector General, and U.S. Departments of Housing and Urban Development, Justice, and Treasury.  ¶¶ 40, 41, 42, 50, 52.  Even if U.S. Bank had a basis and authority to investigate servicer robo-signing when the issue first surfaced in the media in late 2010, it was not directed by Trust investors, which is critical.  The Trustee is fully exculpated from liability if it investigates pursuant to the direction of authorized certificateholders.  *See* PSA, Baczynski Decl. Ex. A, §§ 6.01(e), 6.02(iv).  On the other hand, the Trustee would put itself at risk of liability to certificateholders if, on its own, the Trustee decided to spend Trust assets to conduct an expensive investigation into robo-signing that duplicated the comprehensive efforts of the legion federal and state regulators that, unlike the Trustee, are armed with subpoena power and the threat of government action.[13]

---

[13] Sophisticated investors, including Plaintiffs, undoubtedly were aware of media coverage beginning in the fall of 2010 concerning alleged robo-signing and could have directed U.S. Bank to investigate but opted not to do so.  Certificateholders may have recognized that regulators already were conducting investigations and therefore there was no need to duplicate those efforts using trust assets.  Regardless of the reason, it is not the trustee's job to second-guess investors' decisions about the prudent use of trust assets that belong to investors (net of expenses).

The resulting settlements, which Plaintiffs seize on as imputing knowledge to U.S. Bank of the issue, publicized government findings resulting from the extensive investigations of servicer document execution practices described above, and specifically required the affected servicers to fix those practices and identify and remediate past flaws.[14] Plaintiff fails to identify what was left for U.S. Bank to investigate and stop once these settlements and remediation programs were in place. Plaintiffs simply do not allege plausibly how they were harmed by U.S. Bank's "failure" to act on a problem identified and remedied by myriad state and federal regulators.

    4.    <u>U.S. Bank Had No Duty to Police Alleged Servicer Misconduct</u>

Plaintiffs' vague allegations that the RMBS Trustee had contractual duties to act (¶ 94) are belied by Plaintiffs' failure to cite any such duties and by the express terms of the PSA.

As demonstrated in Section II.C, *supra*, the RMBS Trustee's duties are limited to those expressly stated in the PSA. Of particular relevance here, the PSAs expressly state that: (i) the RMBS Trustee shall not be required "to perform, or be responsible for the manner of performance, of any of the obligations of the Master Servicer under [the PSA] or the Servicers under servicing agreements" (PSA, Baczynski Decl., Ex. A, §§ 6.01(c)(iv)); and (ii) the RMBS Trustee is not responsible for "**any act or omission**" of the Master Servicer or any Servicer (*Id.* at § 6.01(c)(v). The PSA further requires that the Servicer and/or Master Servicer certify to compliance with applicable servicing requirements and standards, and the RMBS Trustee has no duty to verify the contents of those certifications. *Id.* at §§ 11.05, 6.02 (iv), 6.19, & 6.01(h).[15]

---

[14] The settlements are publicly available at http://federalreserve.gov/newsevents/press/ enforcement/20110413a.htm, and http://www.occ.gov/news-issuances/news-releases/2011/nr- occ-2011-47.html.

[15] Plaintiffs cite a 2003 Moody's article—rather than the PSA—to suggest that the RMBS Trustee assumed (or should have assumed) certain duties. ¶¶ 32-34. A Moody's article cannot

Here, Plaintiffs seek to hold U.S. Bank liable for acts and omissions of servicers notwithstanding the fact that the PSA expressly exculpates U.S. Bank for such liability.

Moreover, in recognition of U.S. Bank's limited role, the PSA expressly disclaims any RMBS Trustee duty to *sua sponte* investigate facts about the mortgage loans or independently ascertain whether any action or inaction of the Master Servicer has occurred. *Id.* at § 6.19. Instead, the PSAs provide that a specified quorum of certificateholders may direct the RMBS Trustee to perform such investigations or other extraordinary tasks, if they pay for the investigation (either directly or, if permitted under the PSA, from Trust assets). *Id.* at § 6.02(iv). The reason for this procedure is simple: investigations can be expensive, and the only funds available for such investigations are Trust assets that, net of expenses, belong to certificateholders. Plaintiffs do not allege that they—or any other certificateholders—ever directed U.S. Bank to investigate servicing issues.

### 5. Plaintiffs Do Not Coherently Plead How They Were Harmed

Plaintiffs make the conclusory allegation that they have "incurred substantial damages, *most of which* are attributable to losses from the very foreclosure-related, robo-signing and servicing violations alleged in [the SAC]." ¶ 104 (emphasis added). This allegation is both insufficient and implausible.

The suggestion that "most" losses by Trust investors stem from robo-signing is not credible. In this and other actions involving other financial institutions, Plaintiffs' counsel has

---

impose extra-contractual obligations, and Plaintiffs omit that the same article also stated that, after 2003, "Moody's will take into consideration the trustee's interpretation of their [limited, ministerial] role as evidenced by past performance on behalf of investors." Claire M. Robinson, *Moody's Re-examines Trustees' Role in ABS and RMBS*, Moody's Investors Service at 7 (Feb. 4, 2003) (emphasis added), attached hereto as Exhibit D to the Baczynski Decl. All of the Trusts were created in 2005 or later and therefore, according to Moody's own statements, were rated based on the understanding that RMBS Trustee would play a limited, ministerial role.

repeatedly claimed that RMBS losses are the result of irresponsible lending, not robo-signing.[16]

Courts have similarly recognized that there have been market-wide losses in RMBS.  *See*, *e.g.*,

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 591 (E.D. Pa. 2009)

(complaint is "silent as to how the [alleged] loss can be distinguished from the market-wide

losses in mortgage-backed securities generally").

Similarly, although in the SAC Plaintiffs attempt to pin their RMBS losses on robo-

signing, their own public filings tell a different story, blaming the decline on "market

conditions": "[m]arket conditions have resulted in a deterioration in fair values for non-

guaranteed mortgage-backed and other asset-backed securities."  *See* Commerce Bancshares,

Inc. Form 10-K for Fiscal Year 2012, Baczynski Decl., Ex. B, at pp. 9-10

Moreover, Plaintiffs' liability and damages theory cannot be reconciled.  The crux of the

SAC is that: (a) servicers robo-signed foreclosure documents (which presumably *benefited*

certificateholders through accelerated foreclosures);[17] (b) the practice was exposed; and (c) new

legal requirements have been imposed on foreclosures to prevent robo-signing (through

---

[16] ¶ 27 (blaming the national financial and economic crisis "in large part [on] irresponsible lending practices"); *In Re: Residential Capital, LLC, et al.,* No. 12-12020, 2013 WL 2248980 (Bankr. S.D.N.Y. May 23, 2013) (Trial Motion, Memorandum); *see also VNB Realty, Inc. v. Bank of Am. Corp.*, No. 11-CIV-6805(PGG), 2012 WL 7656776 (S.D.N.Y. Dec. 19, 2012) (First Amended Complaint) (plaintiff-counsel on behalf of certificateholders alleging breaches of representations and warranties by depositor/underwriter caused harm to trust corpus); *Wells Fargo Bank, N.A., v. LaSalle Bank Nat'l Ass'n*, No. 11-C-166, 2011 WL 2470635 (N.D. Ill. June 20, 2011) (plaintiff-counsel representing trustee on behalf of certificateholders alleging originator of loans breached representations and warranties associated with sale of certain loans into trusts thus causing harm to trust corpus); *Wells Fargo Bank, N.A. v. La Salle Bank Nat'l Ass'n*, 643 F. Supp. 2d 1014 (2009) (same); *Wells Fargo Bank, N.A., v. LaSalle Bank Nat'l Ass'n*, No. 307CV00449, 2008 WL 2611541 (S.D. Ohio Apr. 22, 2008) (First Amended Complaint) (same); *LaSalle Bank Nat. Ass'n v. Merrill Lynch Mortg. Lending, Inc.*, No. 04 Civ. 5452 (PKL), 2007 WL 2324052 (S.D.N.Y. Aug. 13, 2007) (same).

[17] To be clear, U.S. Bank does not condone any improper conduct by any servicer.  From a damages and loss causation perspective, however, Plaintiffs fail to plead how robo-signing itself harmed certificateholders.

regulatory settlements or otherwise) that have increased the costs of foreclosures.[18] Accordingly, under Plaintiffs' theory, U.S. Bank should have stopped robo-signing by servicers, yet U.S. Bank also should be held responsible for increased costs that ensued once robo-signing was stopped. That theory cannot pass the plausibility test.

As a separate matter, U.S. Bank cannot be responsible for increased costs associated with new foreclosure laws and requirements that were designed to prevent the alleged servicing misconduct about which Plaintiffs complain. The PSAs make clear that:

> [n]otwithstanding anything in this Agreement to the contrary, neither the Securities Administrator nor the Trustee shall be liable for special, indirect or consequential losses or damages of any kind whatsoever (including, but not limited to, lost profits), even if the Trustee or the Securities Administrator, as applicable, has been advised of the likelihood of such loss or damage and regardless of the form of action.

PSA, Baczynski Decl., Ex. A, § 6.01(j).

Plaintiffs also plead a catchall list of other "additional expenses" purportedly caused by robo-signing, such as sanctions, fines and penalties imposed on servicers, attorney's fees and costs for re-filing documents, attorneys fees for defense of government investigations, etc. ¶ 60. But Plaintiffs do not allege that any of those costs were actually borne by Trust investors as opposed to the servicers who were the subject of the regulatory actions described in the SAC.

Finally, Plaintiffs do not even allege that they actually held investments in the Trusts when the alleged robo-signing occurred. Plaintiffs allege that they purchased certificates of the Trusts, but they do not say when they did so, whether they still hold any certificates, and, if not, when they sold them. These omissions are fatal if for no other reason than, if Plaintiffs sold their

---

[18] *See*, *e.g.*, ¶ 58 ("Due to Defendant's and the Master servicer's and Servicers' failings, no foreclosure can take place at the cost anticipated when Plaintiffs invested in the Trusts, because the costs associated with preparing foreclosure documentation and participating in the enhanced foreclosure process have increased exponentially.")

securities before the alleged breach occurred (or bought them afterward), the servicing conduct alleged in the SAC could not have caused their losses.

6.    Plaintiffs' Conflict of Interest Theory Is Implausible and Does Not Save the SAC

Plaintiffs cannot identify any contractual *obligation* for U.S. Bank to investigate robo-signing.  Accordingly, they claim that U.S. Bank had *discretion* to prevent servicer robo-signing but chose not to exercise that *discretion* because of a conflict of interest, namely that U.S. Bank, acting as a servicer for unrelated loans, was engaged in "the exact same activities".  ¶ 72.  This conflict of interest theory does not withstand scrutiny.

First, while the so-called "discretion" purports to arise "[u]nder the PSA," (¶¶ 70, 86) the PSA is clear that a discretionary right of the RMBS Trustee cannot be construed as a duty.  PSA, Baczynski Decl., Ex. A, § 6.02(vii) ("The right of the Trustee … to perform any discretionary act enumerated in this Agreement shall not be construed as a duty…").  To state a claim—whether under a contract or tort theory—Plaintiffs must identify a duty that was breached, as no cause of action exists for breach of discretionary right.

Moreover, the notion that U.S. Bank, as RMBS Trustee, is liable for not launching its own investigation into servicing of the Trusts based on the servicers' regulatory settlements contradicts the structure of the transactions because an RMBS Trustee is not required to investigate unless certificateholders of the Trusts direct it to do so and provide reasonable indemnity.  *Id.* at §6.02(iv).  As a result, Plaintiffs fail to plead that a conflict of interest prevented U.S. Bank from taking action that it otherwise would have taken.  It is simply not plausible to infer that, absent a purported conflict of interest, U.S. Bank would have voluntarily taken actions (*i.e.*, launching servicer investigations) that are inconsistent with its limited bargained-for duties.  Courts recognize that an actionable conflict of interest does not exist if a trustee acts consistently with the terms of the indenture agreement.  *CFIP,* 738 F. Supp. 2d at

475 (S.D.N.Y. 2010) (rejecting investor's claim that the trustee had an improper conflict of interest when the trustee was acting consistently with the terms of the trust indenture).

Plaintiffs' conflict theory is further belied by the fact that Plaintiffs do not plead that *any* RMBS trustee that did not have U.S. Bank's so-called conflict of interest took the steps that Plaintiffs claim that U.S. Bank should have taken. As a result, the inference advocated by the plaintiffs—that U.S. Bank did not police robo-signing because it had a "conflict"—falls flat.

The limited cases in which courts have found conflicts by indenture trustees involve clear conflicts in which the trustee directly acted to prioritize its own pecuniary position over trust beneficiaries, such as "where the indenture trustee is a general creditor of the obligor, who is in turn in financial straits." *E.F. Hutton Sw. Props. II, Ltd. v. Union Planters Nat'l Bank*, 953 F.2d 963, 972 (5th Cir. 1992). No such conflict is alleged here.

In contrast, courts routinely dismiss conflict claims against indenture trustees where, as here, the Plaintiff asserts only a hypothetical conflict, or the security holder fails to demonstrate that the trustee actually took action that financially disadvantaged the security holder while advancing its own financial interests. *See id.* at 972 ("A mere hypothetical possibility" that an indenture trustee would allow its personal financial interest in other unrelated matters to sway its actions "does not suffice" to state a claim).[19] For example, in *Ellington*, the court rejected RMBS trust certificateholders' argument that the trustee had an improper conflict of interest because, rather than terminating the servicer upon learning of alleged servicer misconduct, the

---

[19] *See also Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 73 (2d Cir. 1988) (rejecting claim that trustee had conflict because no evidence of direct or indirect financial benefit to the trustee from its actions); *CFIP*, 738 F. Supp. 2d at 475 (rejecting claim that trustee had conflict of interest that affected its actions based on revenues from other transactions with same parties which are "infinitesimal in comparison with the overall revenues of these financial institutions"); *Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.*, Nos. 84152, 98 CIV 6907, 2000 WL 877004, at *2 (S.D.N.Y. June 30, 2000) (explaining the trustee did not have a conflict of interest based on its interest in "continu[ing] to receive lucrative trustee work").

trustee secured a release for itself. 837 F. Supp. 2d at 187. The court reasoned that "Plaintiffs make no particularized allegations that [the trustee] financially benefitted from its decision not to terminate [the servicer] or otherwise conspired with [the servicer] to defraud the trusts, which are the classic hallmarks of a conflict of interest." *Id.*

Here, Plaintiffs do not allege how U.S. Bank financially benefited by not investigating robo-signing absent a direction of certificateholders. They offer nothing more than unfounded theoretical motives, which are insufficient to state a claim.

### B.   Each of Plaintiffs' Five Counts Fails

As set forth above, the SAC fails because it is inadequately pled, and the theories are implausible. We summarize below how these failings lead to the dismissal of the five counts.

#### 1.   Count I Should Be Dismissed for the Reasons Set Forth Above

In Count I, Plaintiffs allege that the PSAs provided U.S. Bank with *discretion* to stop robo-signing but that U.S. Bank failed to exercise that discretion because of a conflict of interest, namely its own servicing practices. This claim fails for myriad reasons set forth above: (i) Plaintiffs have not identified a PSA provision that U.S. Bank breached; (ii) even if U.S. Bank had a discretionary right to take action, the PSA expressly provides that such a right "shall not be construed as a duty" PSA, Baczynski Decl., Ex. A, § 6.02 (vii); and (iii) Plaintiffs have not alleged any actual conflict or what U.S. Bank was required to do once it had "notice" in April 2011 that the OCC and FRB had addressed servicer robo-signing.

#### 2.   The "Tort" Claims, Should Be Dismissed for Multiple Reasons

Plaintiffs' claim that U.S. Bank breached a duty by failing to stop servicer robo-signing fails for all of the reasons set forth above, as well as for two additional reasons.

First, these claims are duplicative of the breach of contract claim in Count I, in that Plaintiff alleges that under the PSA, U.S. Bank had a duty to prevent robo-signing but failed to

do so.  (*Compare* ¶¶ 67-70,73 with ¶¶ 90-93, 95.)  Under New York law, "[i]n order to sustain a tort action separate from the breach of contract action, the tortious conduct must have breached a legal duty existing independently of the contractual relations between the parties." *See G.D. Searle & Co. v. Medicorp Commc'ns, Inc.*, 843 F. Supp. 895, 909 (S.D.N.Y. 1994).[20]  "'[A] cause of action for breach of fiduciary duty that is merely duplicative of a breach of contract claim cannot stand.'"  *Ellington*, 837 F. Supp. 2d at 193 (quoting *Grund v. Delaware Charter Guarantee & Trust Co.*, 788 F. Supp. 2d 226, 249-50 (S.D.N.Y. 2011)).[21]

Second, the New York Court of Appeals has held that indenture trustees, such as U.S. Bank, do not owe a fiduciary duty prior to an Event of Default, and Plaintiffs here have not alleged an Event of Default.  In *AG Capital Funding Partners*, the New York Court of Appeals rejected a claim that an indenture trustee owed fiduciary duties because the plaintiff "cannot point to any provision in the indentures that places fiduciary obligations on [the Trustee] prior to an event of default."  896 N.E.2d at 67.  The Court distinguished fiduciary duties from a trustee's duty to perform ministerial duties with due care and explained that "mere allegations that a fiduciary duty existed, with nothing more" cannot survive judicial scrutiny.  *Id.* at 67-68. Applied to the facts here, Plaintiffs fail to identify any provision of the PSA in which the RMBS Trustee assumed any fiduciary duties, and therefore Claim III should be dismissed.[22]

---

[20] *See also OEI v. Citibank, N.A.*, 957 F. Supp. 492, 521 (S.D.N.Y. 1997) (merely restating contract claim does not provide independent basis for claim of aiding and abetting fraud).

[21] *See also Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 390 (N.Y. 1987) (dismissing tort claim as duplicative because "[e]ach of the[] allegations . . . is merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract"); *Metro. W. Asset Mgmt. v. Magnus Funding Ltd.*, No. 03 Civ. 5339(NRB) 2004 WL 1444868 at *8 (S.D.N.Y. June 25, 2004) (dismissing fiduciary duty claim because it "arises out of the same facts as [the] breach of contract claim . . . .")

[22] *See Millennium Partners, L.P. v. U.S. Bank Nat'l. Ass'n*, No. 12 Civ. 7581(HB), 2013 WL 1655990, at *4 (S.D.N.Y. Apr. 17, 2013) (dismissing fiduciary duty claims because plaintiffs did not allege an Event of Default); *see also Ellington*, 837 F. Supp. 2d at 192 (reiterating *AG*

### 3. The Negligence Claim Is Inadequately Pled

In Count IV, Plaintiffs allege that the RMBS Trustee was negligent because it "had a duty to perform its ministerial duties with due care" (¶ 100), which it breached by allowing the Master Servicer to sign foreclosure documents in contravention of the PSA, which requires the RMBS Trustee to sign certain documents.  ¶ 102.

Like the other tort claims, this claim repackages the breach of contract claims and must be dismissed.  "Merely charging a breach of a 'duty of due care', employing language familiar to tort law, does not, without more, transform a simple breach of contract into a tort claim." *Ellington,* 837 F. Supp. 2d at 203 (dismissing negligence claim that "arises out of conduct that plainly falls within the subject matter of the PSA") (citation omitted).[23]

Moreover, Plaintiffs mischaracterize the RMBS Trustee's duties by alleging that it was "required to execute certain documents associated with the Trusts exercising its rights to foreclose on a property."  ¶ 102.  Not surprisingly, Plaintiffs cite no authority for that allegation, which is inconsistent with the different roles of the parties, as explained supra at II.C & D.

### 4. The Breach of Contract Claim Is Unintelligible

Count V is premised on a purported "Breach of Express Contract," yet Plaintiffs again fail to reference even a single provision in the PSA, which alone warrants dismissal.  *See Ellington*, 837 F. Supp. 2d at 189.  Rather, Plaintiffs claim only that U.S. Bank did not "hold the

---

*Capital;* trustee's obligation to avoid conflicts of interest did not rise to the level of a fiduciary duty); *Raymond James & Assoc. v. Bank of N.Y. Trust Co.* No. 8:07-CV-239-T-27(TBM), 2008 WL 4279629, at *5 (M.D. Fla. Sept. 18, 2008) ("Implying a duty . . . under the guise of a fiduciary duty is prohibited by the Indentures and contrary to New York law.").

[23] *See also Metro. W.*, 2004 WL 1444868, at *8-9 (dismissing negligence claim because plaintiff failed to allege any act or omission that was not based on contractual duties); *Clark-Fitzpatrick,* 516 N.E.2d at 193-94 (dismissing plaintiff's negligence claim because it does not allege violation of a legal duty independent of the contract); *see also AG Capital*, 896 N.E.2d at 68 (finding negligence claim must arise out a duty "separate and apart from [the trustee's] contractual duty"); *Millennium Partners,* 2013 WL 1655990 at *4 (same).

Case 4:13-cv-00517-BCW   Document 25   Filed 08/05/13   Page 28 of 30

loans for the benefit of Certificateholders," which is internally inconsistent with allegations in the SAC that plead the exact opposite allegation. *Compare* ¶ 69 and ¶ 85 with ¶ 108. Plaintiffs offer no clue as to how alleged servicer robo-signing should be tied to a purported failure to hold loans for the certificateholders. Plaintiffs' cryptic allegation that "certain" unidentified loans "were held for the benefit of affiliates of the Master Servicer" (¶ 109) is not only unsupported by any allegations in the SAC but also unintelligible, as no affiliates of any of the three Master Servicers are identified anywhere in the SAC.

## IV.     CONCLUSION

For the foregoing reasons, U.S. Bank respectfully requests that the Court grant its motion to dismiss the SAC in its entirety. Dismissal of the SAC should be with prejudice as repleading would not enable Plaintiffs to cure the fundamental flaw in their theory that seeks to hold the RMBS Trustee liable for alleged servicing misconduct.

Dated:     Kansas City, Missouri                  Respectfully submitted,
           August 5, 2013

                                                  WYRSCH HOBBS & MIRAKIAN P.C.

                                                  /s/  James R. Wyrsch
                                                  James R. Wyrsch       MOBar #20730
                                                  Marilyn B. Keller      MOBar #39179
                                                  1000 Walnut Street
                                                  Suite 1600
                                                  Kansas City, Missouri 64106
                                                  Tel:    (816) 221-0080
                                                  Fax:    (816) 221-3280
                                                  *Attorneys for Defendant*
                                                  *U.S. Bank National Association*

Of Counsel:
Michael S. Kraut (Pro Hac Vice Pending)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 309-6000
Fax: (212) 309-6001

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2013, this document was filed electronically via this Court's Electronic Case Filing system, with notice of this filing served electronically by the Court's Clerk to all designated persons.

/s/  James R. Wyrsch
*Attorneys for Defendant U.S. Bank National Association*